IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| NEW CENTURY TRS HOLDINGS, INC., a Delaware corporation, et al.,[1] | : | Case No. 07-[____] (__) |
| | : | Jointly Administered |
| Debtors. | : | |
| | : | |

## DECLARATION OF MONIKA L. MCCARTHY IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY RELIEF

I, Monika L. McCarthy, hereby declare:

1.  I am Senior Vice President and General Counsel of New Century Mortgage Corporation ("NCMC") and Senior Vice President and Assistant General Counsel of New Century Financial Corporation ("NCF"), a Maryland Corporation and the parent company of New Century TRS Holdings, Inc., a Delaware corporation ("New Century TRS" and together with NCF and various subsidiaries, as described below and including NCMC, the "Debtors"). I have been employed by NCF since December 15, 2000.

2.  I submit this Declaration in connection with the voluntary chapter 11 petitions and first-day motions of the Debtors in the above-captioned chapter 11 cases. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day motion or application. All facts set forth in this Declaration are based on my personal knowledge, upon information supplied to me by people who report to me or are senior

---

[1] The Debtors are the following entities: New Century Financial Corporation, a Maryland corporation; New Century TRS Holdings, Inc (f/k/a New Century Financial Corporation), a Delaware corporation; New Century Mortgage Corporation, a California corporation; NC Capital Corporation, a California corporation; Home123 Corporation, a California corporation; New Century Credit Corporation (f/k/a Worth Funding Incorporated), a California corporation; NC Asset Holding, L.P. (f/k/a NC Residual II Corporation), a Delaware limited partnership; NC Residual III Corporation, a Delaware corporation; NC Residual IV Corporation, a Delaware corporation; New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; New Century R.E.O. III Corp., a California corporation; New Century Mortgage Ventures, LLC, a Delaware limited liability company; NC Deltex, LLC, a Delaware limited liability company; NCORAL, L.P., a Delaware limited partnership.

RLF1-3133870-1

officers or employees with the Debtors, upon information supplied to me by the Debtors' professionals and consultants, or upon my opinion based on my experience and knowledge with respect to the Debtors' operations, financial condition and related business issues. If I were called upon to testify, I could and would testify competently to the facts set forth herein, and I am authorized to submit this Declaration on behalf of the Debtors.

## I.   BACKGROUND

### A.   The Debtors

3.   New Century TRS is a Delaware corporation formed in 1995. In 2004, it formed NCF to operate its business as a real estate investment trust (REIT) and registered NCF's common stock with the Securities and Exchange Commission. NCF provided mortgage products to borrowers nationwide through its operating subsidiaries NCMC and Home123 Corporation ("Home123"). Through its subsidiaries, NCF originates and purchases mortgage loans, sells mortgage loans through whole loan sales and securitizations. The Debtors retain residual economic interests in the loan securitizations. The Debtors also service the loans that have been securitized and certain of the whole loans that they sell.

#### 1.   Loan Origination and Purchase

4.   The Debtors originate and purchase mortgage loans through two divisions, the Wholesale Division and the Retail Division.

5.   The Wholesale Division, which is contained within NCMC, originates and purchases loans through a network of independent mortgage brokers and correspondent lenders. As of December 31, 2006, the Wholesale Division (1) had approved more than 57,000 independent mortgage brokers for submission of loan applications, (2) operated through 34 regional operating centers located in 20 states and (3) employed approximately 1,087 account executives. The broker's role in this process is to identify the applicant, assist in completing the

loan application form, gather necessary information and documents and serve as the Debtors' liaison with the borrower. Correspondent lenders are independent mortgage bankers and financial institutions that sell loans that have already been funded. For 2006, the Wholesale Division was responsible for approximately 85% of the loans originated by the Debtors.

6. The Retail Division, which operates under Home123, originated loans through direct contact with consumers, including through referrals from builders, realtors, and other third parties. As of December 31, 2006, the Retail Division was supported by 262 branch offices and three central telemarketing units employing approximately 1,702 retail loan officers. For 2006, the Retail Division originated approximately 15% of the loans produced by the Debtors.

7. A substantial portion of the loans originated by the Debtors are subprime loans. Specifically, subprime production was approximately 86% of the total loan production for fiscal year 2006. The remaining production consisted of prime and "Alt-A" originations. "Alt-A" typically refers to mortgage loans that fall between prime and sub-prime.

8. The Debtors use credit facilities, generally in the form of master repurchase agreements, to originate and purchase the mortgage loans and to hold the loans pending sale or securitization. Prior to its current financial troubles, the Debtors and their nondebtor subsidiaries used credit facilities totaling $17.4 billion of committed and uncommitted borrowing capacity. The Debtors' lenders include Bank of America, N.A., Barclays Bank PLC, Citigroup Global Markets Realty, Credit Suisse First Boston Mortgage Capital LLC, DB Structure Products, Goldman Sachs Mortgage Company, IXIS Real Estate Capital, Inc., Morgan Stanley Mortgage Capital Inc., and UBS Real Estate Securities (each a "Warehouse Lender").

The Debtors used the proceeds from the sale or securitization of the loans to pay down the credit facilities offered by the Warehouse Lenders.

### 2. Loan Sales and Securitizations

9. The Debtors sell most of the mortgage loans that they originate in the secondary mortgage market through whole loan sales or in the form of securitizations. For whole loan sales, the Debtors sell pools of mortgage loans on a non-recourse basis. Pursuant to the underlying purchase agreements, the Debtors generally commit to repurchase or substitute a loan if (i) a payment default occurs early in the life of the loan (an "Early Payment Default" or EPD claim) or (ii) the selling entity breaches its representations and warranties. Many of these repurchased loans are subsequently resold in discounted loan sales.

10. Prior to settling a loan sale transaction, the buyer typically engages in a due diligence review of a sample of loans in the pool. The buyer typically identifies loans that it elects not to purchase, commonly referred to as "investor kick-outs." Many investor kick-outs are subsequently sold in discounted loan pools.

11. In a securitization, the Debtors sell a pool of loans to a trust for a cash purchase price and a residual interest ownership in the trust (an "OTC"). The trust raises the cash portion of the purchase price by selling senior certificates representing senior interests in the loans in the trust. Purchasers of senior certificates receive the principal collected, including prepayments, on the loans in the trust. In addition, they receive a portion of the interest on the loans. The Debtors receive the cash flows from the OTCs after payment of servicing fees, guarantor fees and other trust expenses if specified over-collateralization requirements are met. Over-collateralization requirements are generally based on a percentage of the original or current unpaid principal balance of the loans and may be increased during the life of the transaction

depending upon actual delinquency or loss experience. The securitization trusts are distinct legal entities not included in the Debtors' Chapter 11 filing.

### 3. Loan Servicing

12. An active and profitable part of the Debtors' business is its servicing platform, which is a division of NCMC. Loan servicing activities are designed and implemented to ensure that the borrowers repay each loan in a mortgage servicing portfolio in accordance with its terms. The Debtors' mortgage servicing rights ("MSR's") are generally established in servicing contracts with third parties. The servicing functions performed typically include: collecting and remitting loan payments; making required advances; accounting for principal and interest; customer service; holding escrow or impound funds for payment of taxes and insurance; and, if applicable, contacting delinquent borrowers and supervising foreclosures and property dispositions in the event of unremedied defaults.

13. Traditionally, during the time that the Debtors held a loan for sale, the Debtors provided interim servicing prior to the disposition of the loan. These servicing functions are often performed pursuant to provisions of the warehouse loan agreements with the Debtors' Warehouse Lenders. Servicing warehoused loans typically does not generate any separate servicing fee income for the Debtors. As a result of defaults under the warehouse credit facilities, the Warehouse Lenders have exercised rights to transition these servicing functions to new servicers. The Debtors are cooperating with this transition.

14. The Debtors presently service approximately $19 billion of loans. For performing the servicing functions, the servicer generally receives a servicing fee, one-twelfth of which is paid monthly, of 0.50% per annum of the outstanding principal balance of each loan in the mortgage servicing portfolio. These servicing fees are typically collected from the monthly

payments made by the borrowers on the loans. In addition, the Debtors receive other remuneration for loan servicing including float benefits representing interest earned on collection accounts where mortgage payments are held pending remittance to investors, as well as mortgagor-contracted fees such as late fees and, in some cases, prepayment penalties.

15. As noted above, Debtor entities, such as NC Residual IV Corporation, own the OTCs or other interests in the securitization trusts. Thus, the estates of these Debtor entities have a significant economic interest in the proper servicing of the securitized mortgage loans.

**B.    Principal Indebtedness**

16. As noted above, to finance mortgage loan production, the Debtors use credit facilities generally in the form of master repurchase agreements (the "Master Repurchase Agreements") with Warehouse Lenders. Pursuant to the Master Repurchase Agreements, each Warehouse Lender provides borrowing ability, either committed or uncommitted, to the applicable Debtor. In the ordinary course of their business, the Debtors use each Warehouse Lender's credit facility, together with their own capital, to fund the production of mortgage loans. Pursuant to the terms of the various Master Repurchase Agreements, the underlying Warehouse Lenders have the right to require, each time funds are advanced to fund a mortgage loan, that the Debtors use a portion of their own capital to cushion that Warehouse Lender against nonperforming mortgage loans. These funds paid by the Debtors as a portion of the proceeds of the mortgage loans are referred to in the industry as the "haircut."

17. The Debtors typically sell a mortgage loan for a profit shortly after originating it, generally within one to three months. When a mortgage loan is sold, the portion of

the line of credit used to fund the mortgage loan is repaid to the Warehouse Lender and the haircut is returned to the Debtors.

18. Prior to repayment, the Debtors' obligation to repay the Warehouse Lender is secured by a security interest in the mortgage loan originated with the funds from that Warehouse Lender's line of credit. The Master Repurchase Agreements require NCF subsidiaries to maintain a collateral balance under the Master Repurchase Agreements such that the total value of the collateral securing the obligations under the Master Repurchase Agreements is at least equal to the value of the obligations under the mortgage loans minus the haircut. If the value of the collateral drops below that amount, the Warehouse Lender is entitled to make a margin call requiring the underlying borrower to post additional cash as collateral.

19. Under the Master Repurchase Agreements, each of the Warehouse Lenders have a right to accelerate the Debtors' repayment obligation (referred to as an obligation to repurchase the mortgage loans financed under the respective agreement) in the event of default.

20. As of the March 31, 2007, over $7 billion was outstanding under the Master Repurchase Agreements.

21. Under the Master Repurchase Agreements, each of the Warehouse Lenders has a right to cease providing financing to the Debtors in the event of default. All the Warehouse Lenders have discontinued providing financing or notified Debtors of an intent to do so as a result of default by the Debtors on the Master Repurchase Agreements.

22. As discussed in further detail below, the Warehouse Lenders have also taken additional actions on the basis of the Debtors' default, including making margin calls for

substantial additional cash collateral, accelerating the Debtors' repurchase obligations, and, in some instances, initiating foreclosure proceedings on the financed mortgage loans.

C.  **Corporate Structure**

   1.  **NCF and its Direct Subsidiaries**

   23.  NCF's common stock traded on the NYSE under the symbol "NEW" from October 1, 2004 until March 12, 2007 and is currently quoted on the "Pink Sheets" under the symbol "NEWC". In October 2004, NCF became the publicly-traded parent corporation of New Century TRS, which directly or indirectly owns the operating subsidiaries. NCF currently operates as a real estate investment trust ("REIT") for United States federal income tax purposes.

   24.  NCF also wholly owns two Delaware business trusts, New Century Capital Trust I and New Century Capital Trust II, which are not debtors in this case.

   25.  NCF also wholly owns two other debtor subsidiaries, NC Residual IV Corporation ("NCRIV"), a Delaware corporation and New Century Credit Corporation, a California corporation. NCRIV was formed in September 2004 to hold the OTCs from the securitizations and other residual interests. New Century Credit Corporation wholly owns New Century Mortgage Securities LLC, which is a Delaware limited liability company and is not a debtor in this case.

   2.  **New Century TRS and its Direct Subsidiaries**

   26.  As noted above, New Century TRS owns NCMC, through which it operates its Wholesale Division and its servicing operations.

   27.  New Century TRS also wholly owns the following entities that are not debtors in this case: (i) New Century Warehouse Corporation, a California corporation and indirectly, its subsidiary, Access Investments II, L.L.C., a Delaware limited liability company;

8

(ii) Newvensure, LLC, a Pennsylvania limited liability corporation, and, indirectly, its subsidiary, Newvensure of Alabama, LLC; (iii) New Century Capital Services, Inc., a California corporation; and (iv) Anyloan Financial Corporation, a Delaware corporation ("Anyloan Financial").

### 3. NCMC and Its Subsidiaries

28. NCMC wholly owns its subsidiary NC Capital Corporation, a California corporation ("NC Capital"), which was formed in December 1998 to conduct the secondary marketing activities of NCF and its subsidiaries and is also a debtor in this case.

29. NCMC also has a 99% ownership interest in debtor New Century Mortgage Ventures LLC, a Delaware limited liability company. The remaining 1% interest is owned by debtor Home123.

30. NCMC also wholly owns the following non-debtor entities: New Century Funding A, a Delaware business trust; New Century Funding SB-1, a Delaware business trust; Von Karman Funding Trust, a Delaware business trust; NC Residual Corporation, a Delaware corporation; NCMC Insurance Corporation, a Hawaii corporation; eConduit Corporation, a California corporation; NC Insurance Services, Inc., a California corporation; and North American Real Estate Solutions, Inc., a California corporation.

### 4. Home123 and its Subsidiaries

31. NCMC also indirectly owns debtor Home123 through Anyloan Financial, which is not a debtor in this case.

32. As noted above, the Debtors' retail operations are conducted through Home123. Home123 has a 1% ownership interest in debtor New Century Mortgage Ventures LLC.

33. Home123 also has various direct and indirect ownership interests in certain non-debtor Texas limited liability companies, each of which is in the process of dissolution.

### 5. NC Capital and its Subsidiaries

34. NC Capital wholly owns the following debtors in this case: New Century R.E.O. Corp., a California corporation; New Century R.E.O. II Corp., a California corporation; and New Century R.E.O. III Corp., a California corporation. These corporations own foreclosed property and have financing credit lines from Citigroup Realty Corp. based on the value of the foreclosed property.

35. NC Capital also wholly owns debtor NC Deltex, LLC, a Delaware limited liability company. Further, NC Capital directly and indirectly owns all the interests in the following debtors that are Delaware limited partnerships: NC Asset Holding, L.P. and NCORAL, L.P. NC Deltex is the general partner of NC Asset Holding and NCORAL.

36. NC Capital also wholly owns debtor NC Residual III Corporation, a Delaware corporation. NC Residual III owns the assets in one of the securitization and certain residual interests.

### D. Events Leading to the Debtors' Chapter 11 Filings

#### 1. Deteriorating Market Conditions

37. Calendar year 2006 was a challenging year for originators of mortgage loans. Interest rates continued their steady increase through the middle of the year. In the second half of 2006, short-term interest rates were generally higher than mid- or long-term interest rates (known as an inverted yield curve). The higher average interest rates offered in 2006 caused consumer demand for home purchase financings and refinancings to decrease from

10

the recent past. Lower consumer demand for mortgage products also contributed to pricing competition within the industry.

38. Furthermore, housing prices have stagnated, with modest declines in some markets. As a result, troubled borrowers had less ability to refinance as a mitigation tool and loan delinquencies increased in calendar 2006.

39. This deteriorating market environment resulted in the Debtors experiencing higher investor rejects, early payment defaults and loan repurchase demands than in prior periods.

**2.    Restatement of Quarterly Results**

40. On February 7, 2007, NCF announced that its Board of Directors had concluded, based upon the recommendation of management, that NCF's previously filed financial statements for the quarters ended March 31, June 30 and September 30, 2006 should be restated to correct potential errors in the application of generally accepted accounting principles regarding NCF's allowance for loan repurchase losses. The allowance for repurchase losses on loans sold is a reserve for expenses and losses that may be incurred from the commitment to repurchase or substitute a loan if a payment default occurs early in the life of the mortgage loan or based on alleged violations of representations and warranties in connection with the sale of those loans by the Debtors.

41. Although NCF's full review of the legal, accounting and tax impact of the restatements is ongoing, NCF previously announced that its restated net earnings for each of the first three quarters of 2006 will be lower than initially reported. Further, NCF also announced that it expected to post a fourth quarter loss and a full year loss, attributable primarily to a lower net gain on sales, a reduction in the carrying value of residual assets, a reduction in the carrying

value of mortgage loans held for sale, and an increase in the allowance for losses on loans held for investment.

### 3. Inability to File Annual Report with the SEC

42. On March 2, 2007, NCF announced that was unable to file its Annual Report on Form 10-K for the year ended December 31, 2006 ("2006 Form 10-K") by March 1, 2007 without unreasonable effort and expense. In connection with the restatement process, the Audit Committee of the NCF's Board of Directors (the "Audit Committee"), advised by its independent counsel who is assisted by forensic accountants, has initiated its own independent investigation into the issues giving rise to NCF's need to restate its 2006 interim financial statements, as well as issues pertaining to NCF's valuation of residual interests in securitizations in 2006 and prior periods.

43. NCF announced that the 2006 Form 10-K would be filed after the completion of the Audit Committee's investigation. In addition, NCF's independent registered public accounting firm, KPMG LLP ("KPMG"), informed the Company that, among other matters, it will need to be informed of the results of the Audit Committee's investigation before completing its audit. Without completion of the audit, NCF cannot file the 2006 Form 10-K.

### 4. Resulting Civil Actions and Federal Government Investigations

44. A week after announcing the restatement, a purported securities class action lawsuit was filed on February 12, 2007 in the United States District Court for the Central District of California against NCF and certain of its officers and directors. The complaint alleges that NCF and the other named defendants violated federal securities laws by issuing false and misleading statements and failing to disclose material facts about NCF, which resulted in artificially inflated market prices of NCF's common stock, and that the plaintiff and the

purported class members purchased NCF's stock at these artificially inflated market prices between April 7, 2006 and February 7, 2007. The complaint seeks money damages in favor of its purported class of purchasers of NCF's securities, the costs and expenses of the action and other relief that may be granted by the court.

45. At least eighteen additional purported class actions were filed in the United States District Court for the Central District of California between February 8, 2007 and March 16, 2007. These complaints name NCF and certain of its officers and directors as defendants and present in large degree the same legal and factual issues as the complaint served on February 14, 2007. The complaints allege various class periods, the longest of which is from April 7, 2006 to March 2, 2007.

46. In addition to the purported class actions, at least eight derivative complaints have been filed against certain of NCF's directors and officers that make essentially the same allegations as the federal securities cases relating to the NCF's restatements. Six of these actions were filed in the Orange County, California Superior Court. Two were filed in the United States District Court for the Central District of California.

47. The Securities and Exchange Commission ("SEC") has requested a meeting with NCF to discuss the events leading up to the announcement of the restatements. Additionally, the SEC has issued a document request for certain documents and has commenced an informal investigation into NCF's restatement and trading in NCF's securities. NCF intends to comply with the SEC's request and is cooperating with the SEC's investigation.

48. On February 22, 2007, NCF received a letter from the NYSE Regulation Inc. indicating that its Market Trading Analysis Department is reviewing transactions in the Company's securities prior to the February 7, 2007 announcement. The NYSE letter requested

certain information from NCF and NCF is cooperating with the request. On March 13, 2007, the staff of the NYSE issued a press release announcing the delisting of NCF's common stock, its Series A Cumulative Redeemable Preferred Stock, and its Series A Cumulative Redeemable Preferred Stock.

49. On February 27, 2007, NCF received a letter from the United States Attorney's Office for the Central District of California (the "U.S. Attorney's Office") indicating that it was conducting a criminal inquiry under the federal securities laws in connection with trading in NCF's securities, as well as accounting errors regarding NCF's allowance for repurchase losses. On or about March 12, 2007, the Company received a grand jury subpoena related to this criminal inquiry. NCF is cooperating with the U.S. Attorney's Office in its investigation.

### 5. Exercise of Remedies By Warehouse Lenders

50. After providing notice that it would be unable to file a timely 2006 Form 10-K on March 2, 2007, margin calls by the Warehouse Lenders increased significantly. In fact, as of March 8, 2007, NCF had received approximately $150 million of margin calls, approximately $70 million of which it was unable to satisfy. The increased margin calls significantly impacted the liquidity of the Debtors.

51. Further, all of the Warehouse Lenders refused to provide financing for the Debtors. As a result, since March 5, 2007, the Debtors were able to fund only a portion of their loan originations. Due to the restrictions on access to the credit facilities, the Debtors stopped accepting loan applications on March 8, 2007.

52. Prior to the Petition Date, all of the Warehouse Lenders declared defaults under their credit facilities and accelerated the Debtors' repurchase obligations.

53. Additionally, certain Warehouse Lenders have notified the Debtors that they intend to sell the mortgage loans financed under the credit facilities and offset the proceeds from such a sale against amounts owed by the Debtors. Other Warehouse Lenders have informed the Debtors that they intend to retain the mortgage loans and will determine the value of the loans for the purpose of determining an offset against amounts owed by the Debtors. These Warehouse Lenders have also notified the Debtors that they reserve their purported rights to seek recovery of any shortfall after that offset. The Debtors have notified these Warehouse Lenders that the Debtors reserve their rights with respect to these actions and that the Warehouse Lenders are obligated to proceed in a commercially reasonable manner.

**6. Resulting State Regulatory Actions**

54. The origination of mortgage loans is principally regulated at the state level. Regulators from the 50 states and the District of Columbia each set their own rules, regulations, and guidelines for originating mortgage loans. The Debtors are currently licensed to originated in all 51 jurisdictions. In addition, there are certain types of loans that are regulated at the federal level. The Debtors are currently approved to originate FHA (Federal Housing Administration) loans and VA (Department of Veteran Affairs) loans.

55. Some states also require licensing to service residential mortgage loans. Some states do not regulate servicing at all, and so there is no license required. The Debtors (principally NCMC) are currently licensed to service (or exempt from licensing) in all 51 jurisdictions.

56. The Debtors inability to fund a portion of its loan originations has led to a significant number of state regulatory actions.

57. Since March 13, 2007, certain of the Debtors received cease and desist orders or suspensions from regulators in Massachusetts, New Hampshire, New Jersey, New York, Connecticut, Maryland, Rhode Island, Tennessee, and California (the "C&D Orders"). From March 14 through March 23, 2007, certain of the debtors also entered into consent agreements and/or orders with regulators from Pennsylvania, Florida, Washington, Iowa, Maine, Michigan, Wyoming, and Idaho (the "Consent Agreements and Orders"). Certain of the Debtors will also be subject to a Stipulated Preliminary Injunction in a case brought by regulators from Ohio.[2]

58. The C&D Orders, the Consent Agreements and Orders, and the Stipulated Preliminary Injunction in Ohio restrain the Debtors from taking certain actions, including, among others, taking new applications for mortgage loans in the relevant jurisdiction. The C&D Orders, the Consent Agreements, and the Stipulated Preliminary Injunction in Ohio also compel the subsidiaries to affirmatively take certain actions, including creating escrow accounts to hold any upfront fees collected in connection with pending mortgage applications, transferring to other lenders the outstanding mortgage applications and unfunded mortgage loans held by the subsidiaries, and providing information regularly to the state regulators regarding the Debtors' activities in the applicable state, including the status of all outstanding mortgage applications and unfunded mortgage loans in that state.

59. NCF is engaged in ongoing discussions with state regulators regarding the Debtors' funding constraints and the impact on consumers who are in various stages of the loan origination process. NCF has advised these regulators that it has ceased accepting loan applications. In addition, NCF has advised these regulators that the Debtors are unable to fund

---

[2] NCF, NCMC, and Home123 are currently subject to a temporary restraining order ("TRO") obtained by the Ohio regulators. The Stipulated Preliminary Injunction has been submitted for court approval, will replace the TRO, and will be effective for 90 days.

any mortgage loans, including mortgage loans for those consumers who were already in the loan origination process with the Debtors. The Debtors have been and continue to work cooperatively with these regulators to mitigate the impact on the affected consumers, including transferring pending loans and loan applications to other mortgage lenders. The Debtors have also been providing daily reports to the various regulators regarding the status of loans in process in their states, as well as responding to ad hoc information requests.

E. **THE DEBTORS' EFFORTS TO ASSIST PROSPECTIVE BORROWERS IN THE PIPELINE**

60. In connection with its efforts to mitigate the impact on consumers resulting from the Warehouse Lenders' actions to cut-off financing, and consistent with its obligations with the various state regulators, the Debtors have made a concerted effort to reduce the number of mortgage loans in their pipeline that were ready for funding or in other stages of processing, but that had not been funded.

61. The Debtors' efforts included returning most of the loans in its pipeline to the mortgage brokers that submitted the loan applications so that the loans could be placed with other lenders. With respect to its Retail Division, the Debtors contacted other lenders and mortgage brokers and, with the borrower's consent, transferred their file information to the other lenders and mortgage brokers for further processing. State regulators also assisted in reducing the pipeline by providing the Debtors with referrals of lenders who were willing to assist the Debtors in disposing of their loan inventory.

62. On March 12, 2007, a few day after the Debtors stopped taking loan applications, the Debtors had slightly over 27,000 loans or loan applications in its pipeline. As a result of the efforts taken by the Debtors and their personnel, as of April 2, 2007, the Debtors have disposed of all loans in its pipeline.

Executed this 2nd day of April, 2007 at Redondo Beach, California.

*[signature]*
Monika L. McCarthy
Senior Vice President and Assistant General Counsel
New Century Financial Corporation